UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

OVERSEAS MEDIA, INC.,
WINBURGH HOLDINGS, LTD. and
OOO NOVYI RUSSKII SERIAL,

04 Civ. 5133 (RJH)

Plaintiffs,

- against -

**MEMORANDUM
OPINION AND ORDER**

SERGEI SKVORTSOV and
OOO FENIX FILM,

Defendants.

-----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/3/06

Plaintiffs Overseas Media, Inc. ("Overseas Media"), Winburgh Holdings, Ltd.

("Winburgh"), and OOO Novyi Russkii Serial ("NRS") bring this action against Sergei

Skvortsov and Phoenix Film (sued as "OOO Fenix Film," hereinafter, "Phoenix"),

alleging violations of federal and New York copyright and trademark law, as well as

unfair competition under New York law, and request a preliminary injunction enjoining

defendants from promoting, marketing, licensing, broadcasting or otherwise attempting to

sell or to distribute a Russian television program, *Nashtoyashie Menty*, within the United

States. Phoenix, a Russian television production company, moves to dismiss the

complaint for lack of personal jurisdiction. For the following reasons, the motion to

dismiss is granted.

## BACKGROUND

The following facts are taken from the pleadings, moving papers, and affidavits in

this matter, and have been construed in the light most favorable to plaintiffs. *Ulitsy*

*Razbitykh Fonarei: Menty* (translated into English, *Streets of Broken Streetlights: The Cops*, and popularly known as "*Menty* ") is a hit Russian television series following the professional and personal lives of its characters, four St. Petersburg police officers. (Compl. ¶¶2-3, 34.) According to plaintiffs, the program is both critically acclaimed and popular with Russian viewership; within Russia, more viewers watch *Menty* than any other locally-produced television drama series, and the Academy of Russian Television awarded the show a prize for best television series in 1999. (*Id.* at ¶¶4-5.)

Plaintiff Overseas Media asserts, among other rights, exclusive ownership over the satellite and cable broadcast rights to *Menty* in the United States. (Sept. 13, 2004 Decl. of Daniel M. Mandil, ¶3.) Plaintiff Winburgh claims it holds the "exclusive right to prosecute infringement actions in respect of home video rights to *Menty* in the United States ... and the exclusive over-the-air broadcast rights to *Menty* within the United States." (*Id.*) Plaintiff NRS asserts ownership over "all rights to *Menty* within the United States ... that are not held by either Overseas Media or Winburgh," including so-called "continuation rights" to the further development of the series. (*Id.* at ¶50.)

Defendant Sergei Skvortsov is the former Chairman of the Board of Directors of TNT, a Russian over-the-air channel. In that capacity, he had primary responsibility for TNT's original purchase of the rights to *Menty* and production of its initial episodes. (Compl. ¶10.) In September 1999, Skvortsov played a role in the founding and development of plaintiff NRS, and was primarily responsible for NRS's subsequent purchase of rights to *Menty* (presumably from TNT). (*Id.* at ¶50.) Following a brief stint at another Russian television network, Skvortsov founded defendant Phoenix in July of 2001. (*Id.* at ¶¶51-52, 54; Aug. 4, 2005 Supp. Decl. of Sergei Skvortsov, ¶2.) According to Skvortsov's declaration, it is a company "created under, and governed by, the laws of

2

the Russian Federation." (July 23, 2004 Decl. of Sergei Skvortsov, ¶5 ("July 23, 2004 Skvortsov Decl.").)

According to plaintiffs, Skvortsov and Phoenix thereafter decided to create an "unauthorized sequel" to *Menty*, entitled *Nastoyashie Menty* (in English, "*The Real Cops*"). (*Id.* at ¶55.) The new program, episodes of which had already been produced at the time the complaint was filed in this matter in June 2004 (*Id.* at ¶78), "features the same leading characters as *Menty*, Larin and Dukalis, and two of the same supporting characters ... It stars the same leading actors, Alexei Nilov and Sergei Selin, and the same supporting actors ... It follows the same storyline. Like *Menty*, it is set primarily in St. Petersburg and follows both the professional and the private lives of its characters, St. Petersburg police officers. In effect, without license, permission, right or authorization, [Phoenix] is filming new episodes of *Menty* and labeling these episodes *Nastoyashie Menty*." (*Id.* at ¶55.) Skvortsov allegedly held meetings in St. Petersburg, Russia in the spring of 2003 in an effort to attract *Menty* cast and other personnel to the new production. (Feb. 28, 2005 Decl. of Julia Sobolevskaya, translated from the Russian, ¶¶12-14 ("Sobolevskaya Decl."); Dec. 6, 2004 Decl. of Mikhail Trukhin, translated from the Russian, ¶8 ("Trukhin Decl.").) He successfully induced members of the original *Menty* cast to join the *Nastoyashie Menty* production, as well as other members of the creative team behind the original series. (Compl., ¶¶62-73.)

In March 2004, counsel for Plaintiffs notified Skvortsov by letter that production of *Nastoyashie Menty* constituted "an infringement of the property interests of *Menty* rights holders and demanded that Defendants cease from production immediately." (*Id.* at ¶74.) Following this letter, on or about March 23, 2004, Skvortsov met with Overseas Media's Russian-based attorney, Alexsandr Berezin, in Moscow, Russia. (June 28, 2004

Decl. of Alexsandr Berezin, ¶6 ("Berezin Decl.").) After some indication from Skvortsov

that efforts to prevent the production of *Nastoyashie Menty* in Russia would be fruitless

(allegedly due to assurances received from Russian officials), Skvortsov then "offered to

sell the United States broadcasting rights to *Nastoyashie Menty* to Overseas Media." (*Id.*

at ¶8.) In April 2004, Berezin informed Skvortsov that Overseas Media refused to

purchase these United States broadcast rights. (*Id.* at ¶12.)

    Plaintiffs aver that Phoenix, via its head of sales, Davletkahanov Ildar

Ravil'evich, then offered the United States broadcasting rights to *Nastoyashie Menty* to

Overseas Media on a second occasion.[1] According to Mikhail Galkin, Overseas Media's

Vice President for Acquisitions and Programming, Davetkahanov called him on May 14,

2004 to discuss offers he had previously made regarding the broadcast rights of various

television programs, and then "offered Overseas Media the opportunity to purchase

broadcast rights to *Nastoyashie Menty*." (June 28, 2004 Decl. of Mikhail Galkin, ¶11-13

("June 28, 2004 Galkin Decl.").) Galkin was "surprised that Davletkhanov would offer

to sell Overseas Media the rights to *Nastoyashie Menty* because I was aware that

*Nastoyashie Menty* is a blatantly infringing replica of *Menty* and that counsel ... had

---

[1] Defendants contest that these offers were ever made. Skvortsov has said he "did not
offer to sell the United States rights to Mr. Berezin" and that "Mr. [Davletkahanov] has
advised me that at no time did he offer to sell the broadcast rights to Nastoyashie Menty
in the United States or anywhere else." (July 23, 2004 Skvortsov Decl., at 6-7; *see also*
Pls.' Sept. 13, 2004 Mem. in Opp. to Defs.' Motion to Dismiss at 13.) Davletkahanov
has said that "[n]o concrete offers or negotiations concerning the series under the
working title "Nastoyashie Menty" took place. If they did, they would have been
reflected in the e-mail logs and in Mr. Galkin's inbox and my sent folder." (July 21,
2004 Decl. of Davletkahanov Ildar Ravil'evich, translated from the Russian, ¶8.)
Davletkahanov also appends e-mail discussion of other offers to his declaration, in
support of the proposition that, as a matter of practice, offers were submitted in formal
written fashion as attachments to e-mail.

    Nevertheless, as is apparent from their briefing, defendants have chosen not to
contest plaintiffs' factual allegations at this juncture, and have treated the allegations
regarding the offers as true for the purposes of their motion to dismiss and this Court's
jurisdictional analysis.

demanded that Phoenix cease production ... I therefore asked Davletkhanov if he was certain he could sell the rights to *Nastoyashie Menty* to Overseas Media. Davletkhanov assured me that he was authorized to sell the rights." (*Id.* at ¶14.) In an additional declaration, Galkin recalled that he received the call on his business cellular phone from Davletkhanov "at some point during my daily morning commute from my home in Guttenberg, New Jersey to the Overseas Media office ... in Manhattan." (Mar. 30, 2005 Decl. of Mikhail Galkin, ¶2 ("Mar. 30, 2005 Galkin Decl.").)[2]

On June 29, 2004, plaintiffs brought the instant action, moving two days later for a preliminary injunction to prevent any further attempts to produce, promote, license or broadcast *Nastoyashie Menty* anywhere in the world. On July 15, 2004, the parties entered into a Stipulation, so ordered on the record by this Court on October 8, 2004, that the defendants would not broadcast, license, or promote *Nastoyashie Menty* in the United States, pending resolution of the preliminary injunction motion. At that time, plaintiffs confirmed through counsel that they were not challenging in this action the production, marketing and distribution of *Nastoyashie Menty* in Russia under Russian law. Rather, plaintiffs were seeking to redress alleged violations of United States law arising from the infringement of plaintiffs' United States distribution rights. (Oct. 8, 2004 Tr. 5.) Thereafter, the parties engaged in extensive discovery on jurisdictional issues, and made supplemental submissions to the Court on the subject of personal jurisdiction over Phoenix.

---

[2] Regarding both offers, the Court notes that it is unclear whether plaintiffs, by averring that Skvortsov and Davletkhanov offered "United States broadcasting rights," mean to indicate that Phoenix offered *worldwide* or otherwise multinational broadcasting rights to the program, of which the United States rights would be a natural subset, or whether they mean to allege that the offers were for the United States rights exclusively. It appears that all of the Phoenix licensing agreements with other entities that have been submitted to the Court are for worldwide or multinational rights, as discussed *infra*.

5

## DISCUSSION

### I.   Applicable Law

As this Court has "allowed the parties to conduct discovery on the jurisdictional issue, [plaintiffs bear] the burden of proving by a preponderance of the evidence that personal jurisdiction exists." *Landoil Res. Corp. v. Alexander & Alexander Services, Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990). However, since the parties did not request a hearing on defendant's Rule 12(b)(2) motion, "all pleadings and affidavits must be construed in the light most favorable to [plaintiffs] and all doubts must be resolved in the [plaintiffs'] favor." *Id.* Where jurisdictional discovery has taken place, plaintiffs' "*prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant ... [and this] *prima facie* showing must be factually supported." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990); *see also Brown v. Grand Hotel Eden*, 2003 WL 21496756, at *3 (S.D.N.Y. 2003).

As a foreign corporation, Phoenix's amenability to suit in this Court regarding plaintiffs' claims of copyright and trademark infringement, as well as unfair competition, will be determined in accordance with New York law. "Because there is no specific federal statute governing personal jurisdiction on a copyright claim, this Court must look to the provisions of state law, namely, [New York's CPLR §§ 301-302 (McKinney 2005).]" *Blue Ribbon Pet Prods., Inc. v. Rolf C. Hagen (USA) Corp.*, 66 F. Supp.2d 454, 459 (E.D.N.Y. 1999); *see also Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 40 (2d Cir. 1989) (holding same with respect to "trademark infringement or unfair competition"). In so doing, the Court will be "mindful that personal jurisdiction inquiries are necessarily fact sensitive because each case is dependent upon its own

particular circumstances." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997). Plaintiffs assert the Court's jurisdiction over Phoenix under both Section 301 (the "doing business" standard) and Section 302 (the long-arm statute) of the CPLR. The Court will discuss each section in turn.

## II.    Section 301

CPLR § 301 codifies the "doing business" standard, under which a foreign corporation is subject to personal jurisdiction in New York if it is found to be "doing business" in the state. Courts have described this standard as "stringent, because a defendant who is found to be doing business in New York in a permanent and continuous manner may be sued in New York on causes of action wholly unrelated to acts done in New York." *Freeplay Music, Inc. v. Cox Radio, Inc.*, 2005 WL 1500896, at *2 (S.D.N.Y. 2005) (internal quotations omitted). "To obtain jurisdiction under CPLR 301, defendant must be 'doing business' at the time the action is brought." *Gross v. Bare Escentuals, Inc.*, 2005 WL 823889, at *3 (S.D.N.Y. 2005). "[A] corporation is doing business and is therefore present in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (internal quotations and citations omitted). A plaintiff employing this provision of New York law to establish jurisdiction over a defendant "must show that a defendant engaged in continuous, permanent, and substantial activity in New York." *Id.* "'Presence' implies substance, continuity, regularity and permanence at the time the action is brought." Weinstein, Korn & Miller, *New York Civil Practice*, ¶301.16 (2005).

7

The classic indicia of such permanent and substantial activities in New York

"include: 1) the existence of an office in New York; 2) the solicitation of business in New

York; 3) the existence of bank accounts or other property in New York; and 4) the

presence of employees in New York." *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236,

268 (S.D.N.Y. 2000). It is undisputed that Phoenix maintains no office, mailing address,

property, or bank account in the United States, and that it employs no personnel as such

in the United States. (July 23, 2004 Skvortsov Decl., ¶5.) Plaintiffs, however, point to

the following as indicia of Phoenix's permanent business presence in New York, and thus

its general amenability to suit in the courts of this forum.

First, Phoenix's Russian-based Head of Sales, Davletkahanov Ildar Ravil'evich,

made several telephonic and e-mail-based sales overtures to plaintiff Overseas Media, a

New York–based company, regarding the rights to Phoenix television programs other

than *Nastoyashie Menty.* (Davletkahanov Decl., ¶4 *passim*; Pls.' Supp. Mem. at 17-18.)

These overtures have apparently never resulted in a sale to Overseas Media, and the

territories contemplated by these offers is unclear.

Second, Phoenix entered into about ten agreements between 2002 and 2004

licensing the broadcasting or distribution rights to certain of its productions to three

foreign entities (British, Hungarian, and Russian). These agreements include the

licensing of the rights to broadcast in the United States as part of a package to distribute

product in multiple nations. (Feb. 28, 2005 Aff. of Gerard A. Riso, Exs C-G, H-K; July

30, 2004 Supp. Decl. of Gerard A. Riso, Ex. A; Defendant Phoenix Film's Response to

Pls.' Second Set of Interrogs., Nos. 1, 5, and 6.)

Third, Defendant Skvortsov, plaintiffs assert, has done work on behalf of Phoenix

in New York during the approximately six months a year he spent at a residence located

in New York from 2000 to 2003.[3] While Skvortsov has described his role as president as "purely ceremonial"—mainly involving the representation of Phoenix at various television associations and academies (Skvortsov Dep. at 73-76)—plaintiffs have endeavored to rebut this assertion. Skvortsov does not receive any salary or compensation from Phoenix, but is 50% owner and president of the company. (July 23, 2004 Skvortsov Decl., ¶ 5; Skvortsov Dep. at 70, 81.) Furthermore, several electronic documents recovered forensically from defendant Skvortsov's New York computer, as well as his deposition testimony referencing weekly phone calls to a Phoenix employee in Russia, are indicative, in plaintiffs' view, of his participation in business on behalf of Phoenix. (July 22, 2005 letter from plaintiffs.)

Plaintiffs specifically argue that the above facts indicate that Section 301 jurisdiction is appropriate over Phoenix under a "solicitation-plus" theory of jurisdiction. (Pls.' Supp. Mem. at 18-19.) Under such a theory, if "solicitation is substantial and continuous, and defendant engages in other activities of substance in the state, then personal jurisdiction may be found to exist." *Landoil Res. Corp.*, 918 F.2d 1039, 1044 (2d Cir. 1990). While the facts that plaintiffs point to might have been useful in establishing the "plus" element of the "solicitation-plus" analysis,[4] it is still essential that

---

[3] This action was filed in June 2004. Skvortsov noted at his October 2004 deposition that, while he had spent approximately 50% percent of his time in Russia and 50% in New York from 2000-2003, he spent only "one month total in the United States" in 2004. (Skvortsov Dep. at 11-12.) Skvortsov also described himself as "currently residing in Russia" (July 23, 2004 Skvortsov Decl., note 1), and made reference to having left New York for Russia by April of 2004. (July 23, 2004 Skvortsov Decl., ¶13.) Plaintiffs have proffered no evidence to refute this testimony and none of the Skvortsov electronic documents that plaintiffs have submitted as indicative of Phoenix "doing business" in New York are dated any later than December 2003 (though some are undated).

[4] *See, e.g.*, *Allojet PLC v. Vantgage Associates*, 2005 WL 612848, at *6 (S.D.N.Y. 2005) ("Under this 'solicitation-plus' rule, once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business.'") (internal quotations omitted).

9

Phoenix's "solicitation in New York ... [first] rise to the level of 'substantial solicitation' needed to trigger the 'solicitation-plus' rule" in the first instance. *Stark Carpet Corp. v. M-Geough Robinson, Inc.*, 481 F. Supp. 499, 505 (D.C.N.Y. 1980). Courts will frequently look to the percentage of a company's revenue attributable to New York business in determining whether solicitation is substantial and continuous. *See, e.g., Aqua Products, Inc. v. Smartpool, Inc.*, 2005 WL 1994013, at *4 (S.D.N.Y. 2005) ("Courts have held that sales in the forum state, which comprise only two percent of a company's total income, fails to satisfy the substantial solicitation test."); *Gross v. Bare Escentuals, Inc.*, 2005 WL 823889, at *5 (S.D.N.Y. 2005) (3-4% of total product sales "insufficient to constitute substantial solicitation"); *Stemcor v. Sharon Tube Co.*, 2001 WL 492427, at *2 (S.D.N.Y. 2001) (where New York orders under 1% of total invoices in the requisite time period, jurisdiction fails); *Hennigan v. Taser International, Inc.*, 2001 WL 185122, at *2 (S.D.N.Y. 2001) (3% of total nationwide sales insufficient); *Pieczenik v. Dyax Corp.*, 2000 WL 959753, at *3 (S.D.N.Y. 2000) (insufficient showing where New York sales were 1.3% of world-wide sales, 1.9% of domestic sales); *Walbro Automotive Corp. v. Apple Rubber Products, Inc.*, 1992 WL 251449, at *4 (S.D.N.Y. 1992) (where forum-related revenue only 0.9% of total annual sales, plaintiff failed to proffer "evidence that defendant's solicitation in this district is substantial or continuous"); *Bush v. Stern Bros. & Co.*, 524 F. Supp. 12, 15 (S.D.N.Y. 1981) (less than 1% of its total business over five years insufficient).

According to Skvortsov, Phoenix generated revenues of over $17.6 million between 2002 and 2004, with only 1.9% of its total sales revenue generated outside the former Soviet Union, and only 0.022% of its total sales revenue attributable to a New York audience. (Defs.' Supp. Mem. at 6, 8-9; *see also* July 23, 2004 Skvortsov Decl.,

¶9.) While plaintiffs complain that defendants' calculations are "crude," they do not claim that Phoenix's revenues attributable to the New York market are a substantial part of its total revenues, only that the New York market is "significant" to Russian-language broadcasters. (Pls.' Supp. Mem. at 21.) The fact that Phoenix has derived so little revenue from this state is unsurprising when one considers the territorial breadth of the Phoenix licensing agreements submitted to the Court as a purported basis for jurisdiction.

Furthermore, the facts that plaintiffs have proffered as to activities of Skvortsov on behalf of Phoenix during periods spent in New York, even when viewed in the light most favorable to plaintiffs, cannot support a finding of Phoenix's presence in this state, particularly at the time the complaint was filed in June 2004. Plaintiffs point to Skvortsov's testimony that he had weekly personal telephone communication with Olga Maneeva, a Phoenix employee in Russia, during the aggregate month he spent in New York in 2004, and label "dubious" his description of these calls as personal. (Pls.' Supp. Mem. at n.6.) Such assertions, however, are insufficient for the purposes of a factually-supported *prima facie* showing. Skvortsov also testified at his deposition that he has maintained the *same* computer for e-mail correspondence at his residence in New York since prior to Phoenix's founding in mid-2001 (Skvortsov Dep. at 271.) The evidence that plaintiffs have uncovered after having this computer examined forensically is minimal: a four-line e-mail written by Skvortsov to Phoenix's head of sales in August 2002 (Ex. 2 to Pls.' July 22, 2005 submission); a December 2003 Skvortsov e-mail to someone apparently unaffiliated with Phoenix in which he revealed his familiarity with the ratings for a Phoenix television program (*Id. at* Ex. 9); and a handful of other items which either Skvortsov received or was copied on, some of which, Skvortsov avers, related to his period of employment with Overseas Media or were unviewable on the

New York computer because they were sent in Cyrillic text. (Aug. 4, 2005 Supp. Decl. of Sergei Skvortsov, ¶3, ¶5.)

When viewed favorably to plaintiffs, such communications might conceivably demonstrate that Skvortsov commented on, or was alerted to, Phoenix-related affairs while he was periodically present in New York during the past four years,[5] but they certainly do not sufficiently establish that Phoenix "has engaged in a systematic and continuous course of business such that it has been present" within this state. *Ventura Associates, Inc. v. Int'l Outsourcing Svcs., Inc.*, 2005 WL 1634002, at *3 (S.D.N.Y. 2005). The facts the plaintiffs have uncovered through discovery portray Skvortsov as involved, at best, in the sort of "isolated and casual activity" that will not confer general jurisdiction over a foreign defendant. *Clarke v. Fonix Corp.*, 1999 WL 105031, at *5 (S.D.N.Y. 1999) (quoting Weinstein, Korn, and Miller's *New York Practice*); *see also Schenker v. Assicurazioni Genereali S.p.A., Consol.*, 2002 WL 1560788, at *4 (S.D.N.Y. 2002) ("occasional and isolated contacts" with the state, even where defendant has business relationships with New York entities, are insufficient for personal jurisdiction under Section 301); *cf. Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 93 *passim* (2d Cir. 2000) (where New York–based "Investor Relations Office," whose "activities are attributable to the [foreign] defendants [under New York agency jurisdictional analysis]," was conducting a broad range of activities for foreign defendants, was costing foreign defendants about $500,000 per year in expenses, and constituted "a substantial physical

---

[5] Certainly, the sworn statements from Julia Sobolevskaya and Mikhail Trukhin describe Skvortsov as taking quite the active role in Phoenix's efforts to create *Nastoyashie Menty* in Russia during the spring of 2003. That Skvortsov may have taken an active role in Phoenix's business affairs *while in Russia* at certain points, however, does not assist plaintiffs in making their showing of New York jurisdiction here.

corporate presence in the State, permanently dedicated to promoting the defendants' interests," its activities met the 'doing business' standard") (internal quotations omitted).

Commentators have noted that "[w]hen a defendant has no permanent locale in the state, and makes no substantial and continuous sales or shipments in the state, it is highly unlikely that it will be found to be 'doing business.' This is true not only under CPLR 301, but as a matter of due process." Weinstein, Korn & Miller, *New York Civil Practice*, ¶ 301.16 (2005). Plaintiffs have not sufficiently demonstrated that Phoenix is constructively present in New York for purposes of general jurisdiction. Therefore, jurisdiction based on the provisions of Section 301 fails.

## III. Section 302

Despite Phoenix's lack of business presence in New York sufficient to trigger general jurisdiction pursuant to Section 301, New York law also provides another, more lenient, route by which plaintiffs may establish jurisdiction. Section 302 provides that, a defendant may be sued in New York "on a lesser showing of forum contacts [than necessary under the "doing business" standard] if the cause of action arises from those contacts." *Walbro Auto. Corp. v. Apple Rubber Prods., Inc.*, 1992 WL 251449, at *4 (S.D.N.Y. 1992). New York's CPLR § 302(a) catalogues the acts which will give rise to specific jurisdiction:

*As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:*

*1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or*

*2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or*

13

*3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he*

> *(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or*

> *(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or*

*4. owns, uses or possesses any real property situated within the state.*

Plaintiffs assert that Sections 302(a)(2), 302(a)(3)(i), and 302(a)(3)(ii) all support jurisdiction here. The Court disagrees.

## A.   Section 302(a)(2) jurisdiction

In support of a finding of jurisdiction under 302(a)(2), which covers causes of action that arise from tortious acts committed within New York, plaintiffs point to two alleged offers to sell the rights to *Nastoyashie Menty* as the requisite "tortious acts committed within the state." These two offers are: the March 23, 2004 in-person offer from Skvortsov to Overseas Media's attorney, Berezin, (Berezin Decl., ¶8), which took place in Russia; and the May 14, 2004 telephone offer placed in Russia by Phoenix's Davletkahanov and received by an Overseas employee, Galkin, at some point during Galkin's daily commute from New Jersey to his office in New York. (Mar. 30, 2005 Galkin Decl., ¶¶ 2, 3.)

The Second Circuit has indicated, after acknowledging that district judges have differed on the issue, that jurisdiction under CPLR § 302(a)(2) will not be found where the plaintiff "fail[s] to allege that [defendant] or his agents committed a tortious act [while physically present in New York] as required for exercise of personal jurisdiction

14

under [this provision]." *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997). In *Bensusan*, a suit involving the creation of a website that allegedly infringed on plaintiff's mark, all of the acts giving rise to the plaintiff's suit were "performed by persons physically present in Missouri and not in New York." *Id.* Finding that it would be "impolitic" to hold otherwise absent some further developments from New York's highest court, the *Bensusan* court clarified that in order to subject "non-residents to New York jurisdiction under § 302(a)(2) the defendant must commit the tort while he or she is physically in New York State." *Id.*; *see also Pieczenik v. Dyax Corp.*, 2000 WL 959753, at *6 (S.D.N.Y. 2000) (where "it is undisputed that [defendant, who allegedly induced infringement of plaintiffs' patents by granting license to plaintiff's New York competitor] is located in Massachusetts … and there is nothing to suggest that [defendant] committed any act while physically present in New York," 302(a)(2) jurisdiction fails "even though plaintiffs may have suffered injury in New York and even though [one of defendant's licensees] may be present in New York," because "plaintiffs have failed to demonstrate that [defendant] committed any act connected to this action while in New York"); *K.C.P.L., Inc. v. Nash*, 1998 WL 823657, at *8 (S.D.N.Y. 1998) ("It is … clear that no tortious act was committed by [California defendant, who allegedly registered an infringing domain name and allegedly made a phone call into New York offering to sell the rights to the site] while physically present in New York. As in *Bensusan*, even if [plaintiff] suffered injury in New York, that does not establish a tortious act in the state of New York within the meaning of § 302(a)(2).") (internal quotations omitted). Here, of course, the offerors were both located in Russia.

Plaintiffs contend that, while the offers may have been made by parties located outside of New York, the scope of *Bensusan* should be limited, and that at least when the

15

tort alleged is infringement, "the physical presence of the defendant is not required for the tort to be viewed [for the purposes of 302(a)(2)] as having occurred in New York." *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 182 (S.D.N.Y. 1995) (pre-*Bensusan* decision). The "rationale underlying this rule is that in cases of trademark infringement, the wrong takes place where the passing off [of the infringing product to actual or potential purchasers] occurs." *Id* at 180. Whatever the impact *Bensusan*'s insistence on physical presence has on the continuing vitality of this approach to Section 302(a)(2), the cases that follow the *Pilates* reasoning are significantly distinguishable on their facts.

In *Pilates* itself, for example, the defendant had mailed into New York a four-page brochure advertising one of its products, attached to which were "order sheets" that were intended to solicit both membership in defendant's program, as well as the purchase of infringing exercise videos and books. As the *Pilates* court noted, however, the advertising material *itself* both infringed on plaintiff's marks and was publicly circulated in New York. It was only "to the extent that the order sheets mailed into New York advertise products and services that, as plaintiff alleges, infringe on plaintiff's registered service marks" that the *Pilates* defendant had physically "passed off its allegedly infringing goods in New York, and thus is subject to jurisdiction [under 302(a)(2).]" 891 F. Supp. at 180; *see also GTFM, Inc. v. Fubutu Home & Educational Media, Inc.*, 2003 WL 22439791, at *3 (S.D.N.Y. 2003) (where company "actually sent some [infringing] sales materials to at least one of the inquiring New York customers," personal jurisdiction under this provision attaches because "by offering goods to customers in New York under the allegedly infringing mark ... the alleged tort is deemed to have occurred in New York.); *Citigroup Inc. v. City Holding Co.*, 97 F. Supp.2d 549, 567 (S.D.N.Y. 2000) ("City National sent direct mailings to New York residents directed at soliciting their

business and displaying the allegedly infringing marks. The attempt to pass off these marks ... occurred within New York because that is where the marks were received and viewed by the direct mailing recipients."). These cases all concern allegations of at least some physical nexus between the infringing material and New York, even if the defendants themselves were not physically present in the state.

Here, not only was Davletkahanov in Russia when he allegedly placed the offering telephone call, but plaintiffs do not, and cannot, make any factual allegation that the call was actually placed to New York. Galkin himself cannot provide the location where he received the alleged offer. (Mar. 30, 2005 Galkin Decl., ¶2.) Whether viewed in the light of *Bensusan* or *Pilates*, the lack of any New York nexus here is fatal to the jurisdictional analysis under Section 302(a)(2). Furthermore, the nature of the offers that plaintiffs allege here, made to Overseas Media itself, are simply not consistent with the type of "passing-off" of infringing product that the *Pilates* line of cases have considered. *See Friars Nat'l Ass'n v. 9900 Santa Monica, Inc.*, 2005 WL 1026553, at *6-8 (S.D.N.Y. 2005) (where defendant corporation selected its mark and participated in filming an allegedly injurious broadcast outside of New York, but did not actively market the television program to broadcast outlets in New York, mere fact that program was indeed broadcast in New York insufficient for New York–based plaintiff to establish personal jurisdiction under 302(a)(2)); *cf. German Educ. Television Network, Ltd. v. Oregon Pub. Broad. Co.*, 569 F. Supp. 1529, 1532 (S.D.N.Y. 1983) (in pre-*Bensusan* opinion, Section 302(a)(2) jurisdiction found where defendant "intended and foresaw" that its marketing proposals be disseminated throughout New York State, and where its "sales message was bounced directly off the satellite into the facilities of ... those significant stations in New

York, a delivery mechanism analogized as the "Star Wars equivalent of the United States Postal Service").

Plaintiffs, alternatively, contend that the creation and production of *Nastoyashie Menty* itself are the tortious acts in question for purposes of Section 302(a)(2) jurisdiction over Phoenix. (Pls.' Supp. Mem. at 8.) They argue that since Skvortsov spent approximately half of his time living in his New York residence during the period "when the idea to produce the infringing series was initially acted upon, when the *Menty* actors and creative team were hired and when production of *Nastoyashie Menty* began," (Pls.' Supp. Mem. at 12), and plaintiffs have evidence that Skvortsov participated in the creation of the program and other Phoenix projects while in Russia, the Court should infer that Skvortsov participated in the creation of *Nastoyashie Menty* while in New York. However, plaintiffs have not made any factually-supported averments that would give rise to such an inference. Affidavits that support the assertion that Skvortsov took an active role in the creation of *Nastoyashie Menty* do not place Skvortsov in New York at the time of any of the alleged activities. Julia Sobolevskaya, an agent who represents actors involved with the original *Menty*, discusses meeting with Skvortsov regarding the new program in the spring of 2003 in St. Petersburg, Russia, and notes that Skvortsov followed up with a call to her in an effort to secure her clients' participation in the program while she was on vacation in Egypt. (Sobolevskaya Decl., ¶12-14.) Mikhail Trukhin, one of the stars of *Menty*, similarly notes Skvortsov's efforts in the spring of 2003 to attract him to the new program, but places all of the communication and interaction between the two in Russia. (Mikhail Trukin Decl., ¶8 *passim.*) Furthermore, plaintiffs' forensic examination of Skvortsov's personal computer at his residence in New York, which he testified has been in use since Phoenix's founding in 2001, uncovered no

evidence that work on *Nastoyashie Menty* occurred in this state. While plaintiffs point to Skvortsov's deposition testimony that during his stays in New York he communicated weekly with Olga Maneeva, Producer General of Phoenix in Russia, and call his depiction of these conversations as strictly personal "dubious" (Pls.' Supp. Mem. at n.6), such assertions do not establish that Skvortsov performed work on *Nastoyashie Menty* here in New York. "Where, as here, there has been discovery on the issue of jurisdiction, ...[t]he plaintiff cannot rely merely on conclusory statements or allegations ... rather, the *prima facie* showing must be factually supported." *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.*, 2001 WL 1468168, at \*3 (S.D.N.Y. 2001).[6]

## **B.    Section 302(a)(3) jurisdiction**

The New York legislature enacted this provision of the long-arm statute to

provide for jurisdiction over torts committed by those outside of New York which cause

---

[6]As an aside, if the "tortious acts" committed within New York for the purposes of 302(a)(2) jurisdiction were the planning and production of *Nastoyashie Menty*, then it is difficult to see how these acts have led to plaintiffs' cause of action "arising" within the meaning of the long-arm statute. Plaintiffs notified the Court through counsel that they were only challenging alleged violations of United States law arising from the infringement of plaintiffs' United States distribution rights in this action, and not the production, marketing and distribution of *Nastoyashie Menty* in Russia under Russian law. (Oct. 8, 2004 Tr. at 5.) "Copyright protection is territorial. The rights granted by the United States Copyright Act extend no farther than the nation's borders." *Quality King Distrib., Inc. v. L'Anza Research Int'l*, 523 U.S. 135, 154 (1998) (Ginsburg, J., concurring) (internal citations omitted); *see also Armstrong v. Virgin Records, Ltd.*, 91 F. Supp.2d 628, 634 (S.D.N.Y. 2000) ("As a general principle, it is not seriously disputed that United States copyright laws do not have extraterritorial effect, and that infringing acts that take place entirely outside of the United States are not actionable under our copyright laws."). Thus, it does not appear that the allegedly infringing acts giving rise to plaintiffs' copyright cause of action can be the creation or broadcast of the program itself in Russia (or assistance by Skvortsov with that process in New York). Plaintiffs have, incidentally, further notified the court that they wish to narrow the injunctive relief they seek to only those activities aimed at the United States market, due to a third party's filing an infringement action under Russia law in Russia. (Mar. 16, 2005 letter to the Court from plaintiffs.)

19

injury within the state. As the *Bensusan* court observed, however, "the Legislature limited its exercise of jurisdictional largess" in its enactment of this section, 26 F.3d at 29, and there are several requirements to be met in order for a New York court to find jurisdiction over a non-resident under the two subsections of 302(a)(3).

With respect to 302(a)(3)(ii), the defendant must firstly commit "a tortious act outside the State; second, ... the cause of action [must arise] from that act; third, ... the act [must have caused] injury to a person or property within the State; fourth, [the defendant must have] expected or should reasonably have expected the act to have consequences in the State; and fifth, [the defendant must have] derived substantial revenue from interstate or international commerce." *LaMarca v. Pak-Mor Mfg. Co.*, 735 N.E.2d 883, 886 (N.Y. 2000). In order to making a showing of jurisdiction under 302(a)(3)(i), the plaintiff must establish the first three elements, and a demonstration that the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state" will replace the fourth and fifth elements. Under 302(a)(3), each element is "essential," and if plaintiffs fail to proffer sufficient evidence for any element, "it is dispositive of the issue" of personal jurisdiction under this provision. *Trafalgar Capital Corp. v. Oil Producers Equipment Corp.*, 555 F. Supp. 305, 310 (S.D.N.Y. 1983) (abrogated on other grounds).

To establish an out-of-state tort, plaintiffs point to the allegation that Phoenix has "twice offered to sell the rights to broadcast its infringing series in the United States (and thus New York) to Plaintiffs" as the extraterritorial tort for purposes of jurisdiction under

this provision.[7] (Pls.' Sept. 13, 2004 Mem. in Opp. to Defs.' Motion to Dismiss at 24.)
As plaintiffs' counsel described the offers at oral argument, "it doesn't matter whether the
offer was made between two people located in Madagascar, the offer to sell infringing
product to a New York corporation into New York … constitutes a tort…." (Oct. 8, 2004
Tr. 8.)

Assuming for the purposes of this motion that the two offers were tortious, the
issue becomes whether they caused injury to Overseas Media in New York. Prior to the
late 1970s, New York courts had determined that commercial torts did not cause 'injury
within the State' for purposes of CPLR 302(a)(3). In 1978's *Sybron Corp. v. Wetzel*,
however the New York Court of Appeals "interpreted the long-arm statute to encompass
commercial torts but emphasized that the [tortious act] *must have an impact or locus
within the state.*" *Trafalgar Capital Corp.*, 555 F. Supp. at 312 (emphasis added).

---

[7] In a similar manner to their approach to the jurisdictional question under 302(a)(2),
plaintiffs offer an alternative set of "tortious acts" that have occurred outside of New
York. They contend that the tortious acts in question, for purposes of 302(a)(3), are
actually the activities surrounding production of *Nastoyashie Menty* in Russia, as opposed
to simply the two offers made to Overseas Media to sell the rights to the program. They
further assert that the existence of the competing series has created foreseeable injuries in
New York, in that "[d]ue to the existence of a virtually identical series, and the
consequent dilution of the *Menty* brand, fewer Russian-speaking New Yorkers will buy
*Menty* DVDs and video cassettes and fewer Russian-speaking New Yorkers will watch
*Menty* on Plaintiffs' channels." (Pls.' Supp. Mem., at 16.) However, as discussed *supra*
note 6, United States law regarding violations of copyright will not apply
extraterritorially. Furthermore, following the above assertions, plaintiffs notified the
Court that they wished to narrow the injunctive relief they seek only against any efforts to
distribute *Nastoyashie Menty* in the United States. Accordingly, the Court will examine
whether the offers of the United States broadcast rights would qualify as acts sufficient
for this Court to assert personal jurisdiction over Phoenix.

Even if the Court were to analyze the jurisdictional question using the production
of the series in Russia as the tortious acts in question, the attenuated relationship between
the acts committed in Russia and any theoretical resulting injury in New York would
cause the long-arm jurisdictional analysis to fail. "Undoubtedly, the exercise of personal
jurisdiction must be based on a more direct injury within the state and a closer
expectation of consequences within the state than the type of indirect financial loss
alleged by [plaintiff]." *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990).

Several courts have articulated the types of harm that will satisfy the "injury to person or property within the state" requirement under CPLR 302(a)(3) for infringement actions. "Injury within the state includes harm to a business in the New York market in the form of lost sales or customers." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp.2d 549, 568 (S.D.N.Y. 2000); *see also Savage Universal Corp. v. Grazier Const., Inc.*, 2004 WL 1824102, at *9 (S.D.N.Y. 2004) (injury stemming from tortious infringement in New York, for the purposes of long-arm jurisdiction, can occur in the "form of damage to goodwill, lost sales, or lost customers."); *Ivoclar Vivadent, Inc. v. Ultident, Inc.*, 2005 WL 1421805, at *4 (W.D.N.Y. 2005) (same); *American Network v. Access Am. / Connect Atlanta*, 975 F. Supp. 494, 497 (S.D.N.Y. 1997) ("The New York Court of Appeals has interpreted injury 'within the state' to include harm to a business in the New York market through lost sales or lost customers."); *In re Houbigant Inc.*, 914 F. Supp. 964, 979 (S.D.N.Y. 1995) ("The New York courts have held that loss of customers or business constitutes an 'injury' for the purpose of determining jurisdiction under CPLR Section 302(a)(3)").

In certain circumstances, plaintiffs may satisfy the injury requirement by demonstrating that in-state economic injury from an out-of-state tort is anticipated, even if actual economic injury has not yet occurred. In *Sybron*, a New York corporation brought suit for theft of trade secrets against a nonresident former employee and his new employer, a New Jersey competitor of plaintiff in the production of glass-lined equipment. The court held that subdivision (a)(3) could be used to enjoin the hiring. The "admitted and controverted facts give rise to the probable inference that there is a conscious plan to engage in unfair competition and misappropriation of trade secrets," the court found, and plaintiff met the New York injury requirement with a showing of the

22

"threatened loss of important New York customers," as hearing testimony had demonstrated that the defendant competitor had already solicited, and received shipping orders from, one of plaintiff's major customers. *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 413 N.Y.S.2d 127, 131-32, 385 N.E.2d 1055 (1978); *see also Ivoclar Vivadent, Inc.*, 2005 WL 1421805, at \*4 (though 302(a)(3) jurisdiction failed on foreseeability grounds, court cited *Sybron* for the proposition that plaintiff may allege anticipated in-state economic injury in case where Canadian defendant sold and shipped infringing products to fellow Canadian corporation located near border between Canada and New York); *McGraw-Hill Companies, Inc. v. Ingenium Technologies Corp.*, 375 F. Supp.2d 252 (S.D.N.Y. 2005) (noting same where agreement between New York and Canadian company was set to expire in coming days, and disputed issue of ownership over various intellectual properties had arisen).

Actual injuries resulting from alleged infringement, however, must be manifest (or at least very likely to manifest under *Sybron*) in order to satisfy the New York injury requirement of Section 302(a)(3). In *Gap, Inc. v. Stone Intern. Trading, Inc.*, the court specifically distinguished *Sybron* on the failure of plaintiff to meet the injury requirement in its attempt to demonstrate jurisdiction over the foreign defendants. "The Gap contends that [defendants] committed tortious acts without the state that have caused reasonably foreseeable injury to plaintiff within New York. Specifically, The Gap argues that it has hundreds of stores in New York State … and seeks to avert economic injury from the threatened loss of goodwill among its New York customers who may be confused or misled by Defendants' use of The GAP Marks in Israel … However, foreseeability of consequences in New York is not synonymous with injury in New York, particularly where the plaintiff has not alleged that the defendants solicited any of its customers in

23

New York or sold any infringing products in New York." 1994 WL 670020, at *8 (S.D.N.Y. 1994) (noting the active solicitation of customers in *Sybron*) (internal citations omitted); *Keramchemie GMbH v. Keramchemie (Canada) Ltd.*, 771 F. Supp. 618, 621 (S.D.N.Y. 1991) (in trademark case where "plaintiff has not shown that it has lost any customers or business or has in any other way been injured in New York as a result of defendant's alleged tortious acts," plaintiff had failed to establish 302(a)(3) jurisdiction because that section "mandates that where the defendant commits a tortious act outside of the state, that act must cause injury *within* the state to create personal jurisdiction over the defendant. Such injury in the state must be direct and not remote or consequential.") (emphasis in original).

In the instant case, plaintiffs have not articulated what economic injury would result from the two alleged offers made by Phoenix. The offers were made to Overseas itself, an entity in a position to prevent any harm from occurring to plaintiffs' interests in the state of New York, and plaintiffs have not alleged, nor factually supported, any attempt or plan by defendants to sell the rights to broadcast *Nastoyashie Menty* in New York to third parties. In their original Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, plaintiffs asserted that broadcasts of the series were imminent "on a Russian network that also broadcasts in the United States." (June 29, 2004 Mem. of Law at 19; *see also* June 24, 2004 Kamorin Decl., ¶50 (noting that Russian trade publications report that RTR, the Russian government's television network, has entered into an agreement with Phoenix to broadcast *Nastoyashie Menty*).) However, defendants have indicated that the program's potential availability to viewers in Russia does not give rise to an inference that it will be made available to viewers in New York. (July 23, 2004 Skvortsov Decl., n.11 (noting that the program "has not been licensed to

RTR's U.S broadcasting arm, and] there is no danger that RTR will broadcast the show in the United States").) Defendants have submitted sworn statements to the Court that Phoenix has not and will not solicit third-party purchasers of "the United States broadcast rights. Indeed ... we have no intention of doing so." (July 23, 2004 Skvortsov Decl., ¶8.) "[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party. Nonetheless, where a defendant rebuts [plaintiffs'] unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction—and [the] plaintiff[ ] do[es] not counter that evidence—the allegation may be deemed refuted." *Allojet PLC v. Vantgage Assocs.*, 2005 WL 612848 at \*3 (S.D.N.Y. 2005).

Following more than a year of jurisdictional discovery, plaintiffs have not assembled any facts that would support anything more than the theoretical possibility of injury in New York based on the potential broadcast or distribution of the show in Russia—foreign activities that plaintiffs no longer request this Court to enjoin. They have pointed to no grounds on which to find any anticipated economic injury in New York stemming from the commission of the acts which would provide the basis for jurisdiction here: Phoenix's alleged offers of the United States rights to the program to Overseas itself. Compare the injury analysis under the long-arm statute in *American Network v. Access Am. / Connect Atlanta*, 975 F. Supp. 494 (S.D.N.Y. 1997), a case where plaintiff asserted that defendant's use of the mark America.Net infringed on a mark it owned, American.Net. There, the court pointed to the threatened and present concrete harms as alleged by plaintiff. "[Plaintiff claims to have] suffered to have lost more than profits. It claims that it has been, and will continue to be, harmed in the New

York market because New York computer users, who are among plaintiff's potential customers, have viewed the mark 'America.Net' on their computer screens in New York when visiting defendant's site and have been confused and deceived by that mark. Those claims of harm in the New York market are sufficient to satisfy the statute's requirement of injury "within the state.'" *Id.* at 497. The plaintiffs there had alleged specific New York injuries resulting directly from defendant's alleged tortious act. Here, no such showing has been made.

While plaintiffs in their briefing of this issue call Overseas's alleged offers to sell the U.S. rights "a form of extortion," (Supp. Mem. in Support of Pls.' Opp. to Defs.' Motion to Dismiss at 15), they have not alleged with specificity any anticipated or actual *New York* injury linked to these offers, beyond the vague possibility that Phoenix's offers to Overseas could indicate that it might make offers to third parties, who might then broadcast the series in the United States (and thus New York). But there is no allegation, nor any evidence, that such a threat was ever made. Indeed, the undisputed evidence is that no such third-party offers were made or contemplated. The causative link between defendants' offer to sell the rights to *Nastoyashie Menty* to Overseas Media, and the potential for injury to Overseas Media as a result of these offers or related activities, is simply too attenuated a predicate for long-arm jurisdiction, especially when viewed in the light of relevant case law. *Compare Citigroup Inc.*, 97 F. Supp.2d at 568 (injury within state requirement "is satisfied by Citigroup's claim that its actual and potential customers in New York are confused or deceived when they view and interact with the City National web sites."). In determining long-arm jurisdiction, "injury within the state for purposes of the statute must be direct, and not remote or consequential." *Faherty v. Fender*, 572 F. Supp. 142, 149 (S.D.N.Y. 1983) (noting necessity of direct injury in both

26

the commercial loss and personal injury context); *see also Plastwood Corp. v. Robinson*, 2004 WL 1933625, at *6 (S.D.N.Y. 2004) (noting that plaintiff's claim of jurisdiction under 302(a)(3) must fail because no sufficient allegation of New York–specific injury, such as the actual loss of customers in New York); *Trump v. Cantieri Di Baia*, 1999 WL 705431, at *2 (S.D.N.Y. 1999).

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss [16] is granted with respect to defendant Phoenix.

SO ORDERED.

Dated: New York, New York
December 29, 2005

Richard J. Holwell
United States District Judge